## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICKY RAY MALONE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-13-1115-D |
| | ) | |
| TERRY ROYAL, Warden, | ) | |
| Oklahoma State Penitentiary | ) | |
| | ) | |
| Respondent.[1] | ) | |

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 24. Petitioner challenges the conviction entered against him in Comanche County District Court Case No. CF-05-147.[2] Tried by a jury in 2005, Petitioner was found guilty of first degree murder and sentenced to death. Petitioner's sentence was reversed on appeal, and he was resentenced in 2010 by a judge. The judge also sentenced him to death. In support of the sentence, the judge found two aggravating circumstances, namely, (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (2) the victim of the murder was a peace officer or guard of an institution under the control of the Department of Corrections, and such person was killed in the performance of official duty. Criminal Appeal Original Record (hereinafter "O.R.") 9, at 1643.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.
[2] Petitioner was initially charged in Cotton County, where the murder occurred, but the case was transferred to Comanche County.

Petitioner presents eight grounds for relief. Respondent has responded to the petition and Petitioner has replied. Docs. 24, 43, and 58. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 30 and 52. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to the requested relief.

## I. Procedural History.

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). In *Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007), the OCCA affirmed his conviction but reversed his death sentence. Upon remand, Petitioner was again sentenced to death. In *Malone v. State*, 293 P.3d 198 (Okla. Crim. App. 2013), the OCCA affirmed his sentence. Petitioner sought review of the OCCA's decision by the United States Supreme Court, which denied his writ of certiorari on October 7, 2013. *Malone v. Oklahoma*, 134 S. Ct. 172 (2013). Petitioner also filed three post-conviction applications, which the OCCA denied. *Malone v. State*, No. PCD-2014-969 (Okla. Crim. App. Jan. 30, 2015) (unpublished); *Malone v. State*, No. PCD-2011-248 (Okla. Crim. App. Apr. 23, 2013) (unpublished); *Malone v. State*, No. PCD-2005-662 (Okla. Crim. App. Oct. 2, 2007) (unpublished).

## II. Facts.

In adjudicating Petitioner's first direct appeal, the OCCA set forth a lengthy summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual

issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

Around 6:20 a.m., on December 26, 2003, Abigail Robles was delivering newspapers in rural Cotton County, just east of Devol, Oklahoma. While driving on Booher Road, she came across a parked white car on the side of the dirt road. [FN4] The white male driver was laying in the front seat, but he was not moving, and his feet were hanging outside the car. Robles thought he might be dead. She drove to the home of Oklahoma Highway Patrol ("OHP") Trooper Nik Green, which was less than a mile away, to ask for his help. Green had been sleeping, but answered the door, listened to Robles's story, told her not to worry about waking him, and reassured her that he would check out the situation for her.

FN4. Robles testified that the driver's side door was open and there were a lot of boxes and papers sitting around the car.

At 6:28 a.m., Trooper Green telephoned OHP dispatch in Lawton and reported what Robles had seen. Green was not scheduled to be on duty that day until 9:00 a.m., but when he learned that the on-duty Cotton County trooper was not available, he volunteered to go check out the situation himself. He went on duty at 6:37 a.m. and informed dispatch shortly thereafter that he had arrived at the scene and discovered a white four-door vehicle and a white male. Green attempted to provide the vehicle tag number, but dispatch could not understand the number, due to radio interference. This was Green's final contact with OHP dispatch. After approximately ten minutes dispatch tried to contact Green with a welfare check ("10–90"), but got no response. After numerous unanswered welfare checks to Green's badge number (# 198) and an unanswered page, dispatch sent various units to Trooper Green's location and contacted the Cotton County Sheriff's Department.

The first person to arrive at the scene was Deputy Charles Thompson of the Cotton County Sheriff's Department. [FN5] He arrived at 7:15 a.m., wearing pajama bottoms, a t-shirt, and sandals. Trooper Green's patrol car was parked on the right side of the road, with the driver's side door open and the headlights on. Thompson walked around the area until he discovered his friend's dead body, face down in the ditch, with his arms

and legs spread, a few feet to the right and front of his patrol car. [FN6] It was obvious from the massive head wound to the back of his head that Green had been shot and that he was dead. Thompson immediately called his dispatch, and the investigation of Green's murder began.

> FN5.  Thompson testified that he had known Nikky Green since they were in the third grade together.

> FN6.  Blood evidence presented at trial established that this was the position of Green's body at the time he was shot.

What happened on Booher Road from the time of Green's arrival until his death can be largely pieced together from the physical evidence at the scene, statements made by Ricky Ray Malone, and the contents of a videotape recorded by the "Dashcam" video recorder mounted in Green's vehicle. According to statements made by Malone, Trooper Green arrived at the scene and attempted to rouse Malone by talking to him and shining a flashlight in his face. Officers who investigated testified that it was obvious from evidence left at the scene that someone had been manufacturing methamphetamine outside his or her car that night. It would have been obvious to Green as well. [FN7]

> FN7.  The area contained substantial evidence of recent methamphetamine production, and Malone admitted at trial that he had been "cooking meth" the previous night.

Green apparently informed Malone that he was under arrest and was able to get a handcuff on his right wrist, before Malone decided that he was not going to go quietly back to jail. [FN8] Malone somehow broke free and a battle ensued between the two men that tore up the grass and dirt in the area and knocked down a barbed wire fence. Malone's John Deere cap ended up in the barbed wire fence, and Green's baton and a Glock 9 mm pistol were left lying in the ditch. [FN9] The fight resulted in numerous scrapes, cuts, and bruises to both men.

> FN8.  Malone acknowledged at trial that he was out on a $50,000 bond at the time, on a pending charge of attempted manufacture of methamphetamine, as well as other related charges.

> FN9.  Malone's friend, Tyson Anthony, testified that the pistol left at the scene belonged to him, but that Malone had borrowed it the previous evening before he left to do the cook, saying he needed it "in case he got into trouble with the police."

Trooper Green's Dashcam recorder was switched on sometime during the course of this monumental struggle. [FN10] Because the Dashcam was directed forward, the video shows only the things that appeared immediately in front of Green's vehicle. The video never shows Trooper Green, but the audio on the videotape, though garbled and sometimes hard to understand, contains a poignant and heartbreaking record of the verbal exchanges between Malone and Green during the six minutes preceding Green's death.

> FN10. Testimony at trial established that Dashcam recorders like Green's come on automatically when the overhead lights are activated and can also be turned on manually, either in the car or with a remote control. Trooper Green's Dashcam was switched on via his remote control at 6:45 a.m. that morning. The remote control had a remote microphone on it, which recorded the sounds at the scene from 6:45 a.m. until the recorder was turned off at 7:50 a.m. While it is possible that Green purposefully turned the recorder on, it is also possible that it got knocked on during the struggle. The remote control was found at the scene, not far from Green's right hand.

The initial sounds on the audio are mostly grunting and unintelligible, as the men seemingly struggle for control. Then Malone appears to gain control and tells Green to lay there and not turn over. Green tells Malone that he didn't have a problem with Malone and that he came to help him. He tells Malone, "Hey, run if you want to go, but leave me." Green pleads, "Please! Please! I've got children." Green also tells Malone that he is married and begs Malone not to shoot him. Meanwhile, Malone repeatedly asks Green where "the keys" are, apparently referring to the keys for the handcuff that is on his wrist, and demands that Green stop moving and keep his hands up. Malone threatens to kill Green if he moves, but also promises that he won't shoot him if Green holds still. Malone searches at least one of Green's pockets, but fails to find the keys. [FN11] When Green suggests that he has another set of keys in his vehicle, Malone responds, "I don't need to know." Green apparently recognizes the significance of this statement and after a few seconds begins pleading again, "Please don't. For the name of Jesus Christ. He'll deliver. Lord Jesus!" [FN12] At that moment a shot can be heard, followed by eleven seconds of silence, and then another shot. [FN13]

> FN11. DNA evidence presented at trial established that a bloodstain on the inside of Green's left front pants pocket came from Malone.

FN12. The Dashcam videotape appears in the record as State's Exhibit 1. The record also contains a transcript of the audio of this videotape, which is in the record as Court's Exhibit 9. Although the transcript was not entered into evidence, text from the transcript was displayed on demonstrative exhibits used during the cross examination of Malone. (Neither the accuracy of the transcript nor the use of these demonstrative exhibits is challenged on appeal.) We have watched and listened to this videotape numerous times. This Court's interpretation of what was said differs slightly from the transcript in a few places, including within Green's final plea. The transcript records Green's final words as follows: "Please don't. In the name of Jesus Christ. Please remember, Lord Jesus." The summary in the text is based upon this Court's best interpretation of what was said. Any differences compared to the transcript are minor and do not affect overall meaning.

FN13. One 9 mm projectile, consistent with Green's own gun, was recovered from his head, and another was recovered from the ground beneath his head. The medical examiner testified that Green's death was caused by a massive head injury to the back of his head, caused by one or more gunshot wounds, at least one of which was likely a contact wound.

Just after the second shot, Malone appears in the videotape, walking in front of Trooper Green's car and behind the open trunk of his white, four-door vehicle. Malone can be seen hurriedly "cleaning up" his makeshift methamphetamine lab—dumping containers of liquid that are sitting on the ground, loading numerous items into the back seat and trunk, throwing and kicking things off the road, and lowering the front hood. [FN14] Less than two minutes after shooting Green, Malone starts his car to drive away, but the car stalls. After almost thirty seconds, the car starts, and by 6:55 a.m. Malone has left the scene.

FN14. Malone left substantial drug evidence at the scene, including two "eight balls" of methamphetamine, which were left laying in the middle of the dirt road.

During the trial the State presented the testimony of Malone's four meth-making comrades: Tammy Sturdevant (Malone's sister), Tyson Anthony (her boyfriend), and J.C. and Jaime Rosser (who were married). [FN15] In December of 2003, these four people were living together in Sturdevant's trailer in Lawton and were jointly engaged, along with Malone, in a regular process of gathering and preparing the ingredients,

making or "cooking" methamphetamine, and then using and distributing the methamphetamine. They all testified that they spent much of Christmas Day in 2003 preparing for a "cook" that night and that when Anthony got sick, Malone decided to go ahead. Malone left late that night, in Sturdevant's white Geo Spectrum, to complete the cook on his own.

> FN15. All four of these witnesses spent time in jail on material witness warrants in this case.

Tyson Anthony testified that Malone appeared in his bedroom about 8:00 a.m. on the morning of December 26 and said that he had shot someone and needed Anthony to hide his sister's car. [FN16] Anthony hid the car behind a day care, about 100 yards from their trailer. Anthony testified that he saw Malone again around 5:00 p.m. that night, that Malone had already partially shaved his head, and that he asked Anthony to go get him some bleach to dye his hair, which Anthony did. Later that night Anthony went with Malone to a hotel in Norman, and Malone told him more about what had happened. [FN17] Malone showed him the gun he had used, which Malone said belonged to "the cop." [FN18] Anthony testified that Malone also referred to the officer as a "Hi–Po," meaning a highway patrolman. Anthony acknowledged that he himself put the gun in a hotel trash can and covered it up with trash. [FN19] Anthony left the hotel and went home, but later called Malone, who was still there, and suggested that he might be able to use the gun to frame someone else. [FN20]

> FN16. Anthony was in jail on a material witness warrant until after his preliminary hearing testimony, when his bond was reduced. He acknowledged at trial that he agreed to testify in exchange for the district attorney's agreement not to charge him as an accessory after the fact or on any prior drug-related offenses. At the time of Malone's trial, Anthony was back in jail, charged with a new count of aggravated manufacture of methamphetamine.

> FN17. At trial Anthony recounted that Malone told him the following. Malone was asleep and woke up to a gun and a flashlight in his face. The cop told him to get out, and Malone tried to run but tripped and fell. The cop got on his back and got a handcuff on him, but then they were rolling around and fighting, until Malone saw a gun on the ground and was able to get it. The cop prayed, said he had kids, and begged Malone not to shoot him or kill him, but Malone said, "You would have done it to me," and shot him twice in the back of the head. (The audio of the videotape does not contain

anything similar to the quoted statement, though the other statements attributed to Malone by Anthony are consistent with the videotape.)

FN18.  Malone told Anthony that he lost the gun he had borrowed from Anthony and that he thought he dropped it at the scene of the shooting.

FN19.  The murder weapon was never found. Malone testified at trial that Anthony got rid of it.

FN20.  During cross examination Anthony testified that at the time of the shooting, he, Sturdevant, the Rossers, and Malone were all "heavy into the use of methamphetamine" and that they were high "constantly," from December 20 until December 26, 2003.

J.C. Rosser testified that when Malone came home on the morning of December 26, 2003, he had a handcuff on his right wrist, bruising on his hands, and some blood on his shirt. [FN21] Malone told Rosser that he had "killed a cop." Malone asked Rosser to give him a ride to his home in Duncan, which Rosser agreed to do. Rosser testified that he and his wife got in the car and that Malone came out wearing different clothes and carrying a white plastic garbage bag. They stopped at Sturdevant's car, and Malone retrieved a big black case from it. They also stopped at a wooded area on Camel Back Road, where Malone got out and disposed of the white bag. [FN22] J.C. Rosser testified that on the way to Duncan, Malone told the Rossers that he had killed a state trooper and that he "was real sorry." [FN23] Rosser testified that he dropped Malone off on the back side of his Duncan home and that he and Jaime went in through the front. They waited in the garage while Malone got the big black case and a gun out of the car and then waited while Malone got his own handcuff key. Malone showed them a "black Glock," saying it was the one he'd used to kill the trooper. Rosser testified that the gun had blood and grass and hair on it. Malone also told Rosser that he "fucked up" and was "sorry." [FN24]

FN21.  J.C. Rosser testified that he was in jail in Stephens County on various methamphetamine-related charges when he first spoke with officers about Malone. Rosser's charges stemmed from a November 2003 raid on his home, which resulted in the Rossers moving in with Sturdevant. Rosser agreed to testify in Malone's case in exchange for having these prior charges dropped and not being charged as an accessory after the fact in Green's murder. Rosser was released on bond after his preliminary hearing testimony in Malone's case.

FN22. With J.C. Rosser's assistance, the white garbage bag was later recovered. Its contents, i.e., Malone's clothing from the morning of the shooting, were entered into evidence at trial.

FN23. J.C. Rosser described Malone's account of what had happened as follows. Malone had been sleeping and was awakened by the officer with a gun and a flashlight. The officer had Malone on the ground, with a knee in his back, when Malone said, "Fuck this," and started fighting and struggling. According to Malone, the officer was hitting him on the head with his baton, and Malone said, "I like it; give me some more." The officer begged for his life, but Malone said, "You would have did it if you were in my shoes. You'd have did the same." Malone then "shot him once and then he shot him again just to make sure," i.e., to "make sure he was dead."

FN24. Rosser testified that in late December of 2003, he, his wife, Anthony, Sturdevant, and Malone were high on methamphetamine together "almost all the time."

Jaime Rosser testified that her husband woke her around 8:30 a.m., on December 26, 2003, and insisted she go with him to Duncan. [FN25] She waited in the car with her husband until Malone came out with a white garbage bag and got in the back seat. Rosser testified that on the way to Duncan, Malone stated, "I killed him. I killed him. I killed a cop." When she turned to look at him, she saw that he had a handcuff on his right wrist. Rosser testified that Malone said he had shot "a Hi–Po" two times in the head and that on the first shot, "the bone part of the skull stuck to the gun, and so [I] shot it again to get the gun clean." [FN26] Jaime Rosser testified consistently with her husband regarding Malone disposing of the white bag and their time in his home that morning. [FN27] She also testified that when she saw Malone back at the trailer that night, he could tell she was upset and told her, "Don't think of it as me killing him; think of him as an animal and I was hunting." Malone also told her that he had gotten everything "cleaned up" and that "there shouldn't be anything left out there to identify [me]." When Rosser asked him, "What about the tape?" referring to the patrol car videotapes often seen on TV, Malone responded, "Oh, fuck." [FN28]

FN25. Jaime Rosser testified that she (like her husband) was in Stephens County Jail (on drug charges stemming from the November raid on their home) when she was first approached about Green's murder, in late December of 2003. Although her husband negotiated the agreement, she got basically the same deal. She was

released and her drug charges were dropped after she testified at Malone's preliminary hearing. She acknowledged on cross examination that she could have gotten as much as a life sentence on the attempted manufacturing charge she faced in the other case and that she was guilty of that charge.

FN26. Jaime Rosser testified that Malone said he fell asleep during the cook, and the officer came up and tapped him on the shoulder. They rumbled around and fought, and the officer got one handcuff on him. She remembered that Malone said that the officer had begged for his life and that Malone responded, "If you were in my shoes, you would do the same thing." Rosser did not remember Malone talking about the officer praying or referring to his family.

FN27. She described waiting in the garage while Malone left to get a handcuff key and then came back and took off the handcuff. Rosser testified to being upset by the sight of the gun, which she described as "nasty," because it "was gooey and it had blood and hair on it."

FN28. A clip from Green's Dashcam video, showing Malone in front of Green's car, was shown on local television stations that same night. Officer Keith Stewart, a Duncan police officer who was familiar with Malone, recognized Malone in the video and immediately reported this information.

Tammy Sturdevant, Malone's sister, also testified. [FN29] She recalled that Malone borrowed Anthony's black handgun before leaving to do the cook on Christmas Night, "just in case there was trouble." She next saw her brother at around 8:00 a.m. the next morning, when he came into her bedroom and said, "I need your help. I need you to call your car in stolen. I—I shot a trooper." Malone then told her and Anthony the details of what had happened. [FN30] Sturdevant testified that Malone had a handcuff hanging from his right wrist, which was bruised and swollen, and his hands were cut. Sturdevant acknowledged that she got Malone the white trash bag for his clothes, and later that day she dyed his hair blond and cut it. [FN31] Sturdevant testified that she, her brother, and all of the occupants of her trailer were heavily into methamphetamine in December of 2003, that methamphetamine distribution was their sole source of income, and that they were all "high all the time," from December 20, 2003, until the morning of the shooting. [FN32]

FN29.  Sturdevant acknowledged at trial that she had lied in all of her initial contacts with law enforcement officers, in an attempt to help her brother. She also admitted that although she had agreed to testify truthfully at Malone's preliminary hearing, she had not done so, because she was still trying to help her brother. Consequently, she remained in jail from the time of Malone's June 2004 preliminary hearing until the time of his May 2005 trial. Sturdevant also testified that she was telling the "absolute truth" at trial and that she expected to be released after the trial ended.

FN30.  Sturdevant described Malone's account of what happened as follows. Malone woke up to a flashlight in his eyes, and an officer made him get out of the car. Malone was on his stomach, with one arm behind his back, and the officer got one cuff on him, but somehow Malone got up. Malone tried to run, but tripped, and was hit on the head a few times, and he and the officer got into a "scuffle" and went into some barbed wire. Malone saw a gun on the ground and picked it up. The officer begged for his life, saying "Jesus Christ, no." Malone also recounted that he said to the officer, "If I wouldn't have done it to you first, you'd have done it to me."

FN31.  Sturdevant also reported her car "stolen" to the Lawton Police Department.

FN32.  Sturdevant also acknowledged that she introduced her brother to methamphetamine.

By December 29, 2003, investigators had found the car driven by Malone, recovered his clothes on Camel Back Road, and obtained significant information from J.C. Rosser and Tyson Anthony about Malone's involvement in the killing of Trooper Green. [FN33] In an interview on this date, Malone acknowledged that what Anthony had told investigators—that Malone had killed the trooper, that he shouldn't have done so, and how it happened—was "true" or "probably true." [FN34] When pressed to take responsibility himself, Malone responded, "I can't—I can't say. If I say anything, I'm going to get the death penalty." Later in the interview Malone stated, "Well, maybe it was an accident."

FN33.  DNA evidence presented at trial established that Green's blood was found on the driver's seat of the car driven by Malone, on a black container inside the car, and on various items of Malone's clothing recovered on Camel Back Road.

Malone testified at trial. He provided a history of his involvement with drugs, legal and illegal, beginning with steroids to get bigger when he was a firefighter, including Prozac to combat depression when his marriage was in trouble, and then Lortabs, which began with a football injury but developed into an addiction. Malone testified that he began using methamphetamine in April of 2002, around the time his mother died. He described the effects of the drug and how his usage of methamphetamine, like his usage of pain pills, increased over time. [FN35] He acknowledged that by October of 2003, his methamphetamine addiction had caused him to be fired from his jobs at the fire department and as an EMT with an ambulance service, and that all of his income was coming from making and selling methamphetamine. Malone claimed that he didn't sleep from December 4 through December 26, 2003, due to being continuously "amped up on meth," and that he was hearing voices and seeing things during this time. [FN36]

FN35.  Malone described how methamphetamine made him moody and paranoid and that he sometimes heard voices and thought he saw things that weren't there—like when he would "hear" people in his attic and when he "saw Bigfoot" while he was out cooking at the lake.

FN36.   Malone acknowledged on cross examination that he was stopped on December 15, 2003, and given a verbal warning for having loaded and concealed weapons in his car. He was stopped again on December 22, 2003, and this time he was charged with attempted manufacturing, possession of precursor ephedrine, and possession of three loaded and accessible firearms.

Regarding the night of December 25, 2003, Malone described hearing voices and seeing "people jumping ... around" as he was stealing and transporting the anhydrous ammonia needed for the cook. He testified that while in the middle of the cook, his back started hurting, so he took some Lortabs and then passed out. He described waking up to a gun and a flashlight in his face and testified that he thought he was about to get robbed or killed. Malone repeatedly denied that he knew Green was connected with law enforcement, until after he had killed him. [FN37] He

described finding a gun and the other man begging him not to shoot. Malone testified that the other man kept trying to get up and that the "voices in my head" told him to shoot him, because the man was "going to get me." So he shot him. [FN38]

> FN37.  Malone testified that he was "fighting for his life" and that he kept "trying to get away from this dude." Malone claimed that he didn't know the person he was fighting was law enforcement until he saw the highway patrol sticker on the man's open car door, after Green was already dead. Malone also testified that it was "too dark" to see that the other man was in uniform and had a badge and that he would have submitted if he'd realized that Green was a highway patrol trooper.

> FN38.   Malone testified on cross examination that he did not notice the handcuff on his wrist until he was back in his car. He couldn't explain what "keys" he kept asking for on the Dashcam video.

Dr. David Smith, a California physician specializing in addiction medicine, testified as an expert witness on Malone's behalf. He provided extensive testimony on his own expertise, particularly regarding methamphetamine, on genetic predisposition to addiction and depression, and on the science of how methamphetamine affects the brain. In particular, Smith explained how when someone is extremely "intoxicated" on methamphetamine, to the point of "amphetamine psychosis," the effect on the person is comparable to paranoid schizophrenia. He explained that like paranoid schizophrenia, amphetamine psychosis can include auditory and visual hallucinations, where an individual will respond to non-existent environmental stimuli or threats. [FN39] Dr. Smith also described less severe, but still serious methamphetamine effects, including a "rage reaction," where the individual responds to an actual threat, but overreacts.

> FN39.   Dr. Smith testified that users sometimes refer to this hallucinatory effect as "tweaking."

Dr. Smith testified that he had met with Malone the previous day (a Sunday) and reviewed various materials associated with the case, including the Dashcam video. Smith testified about the substantial history of addiction and depression in Malone's family and the history and extent of Malone's drug abuse, including how much he was using and its effect on his life at the time of the shooting. [FN40] Smith described the time Malone was convinced he had seen Big Foot, whom Malone thought was after him, which Smith indicated was an example of someone experiencing

amphetamine psychosis. He also recounted that Malone was smoking methamphetamine "every hour" and was "hearing voices" and "seeing things" on the night before and morning of his encounter with Green. [FN41] Dr. Smith concluded that Malone was most likely in a state of "amphetamine psychosis" on the morning of the shooting, making him likely to engage in "crazy, irrational violence." He further testified that he did not think Malone could have formed the intent to commit first-degree murder.

> FN40. Dr. Smith testified that Malone told him that in late December of 2003, he was hardly sleeping and "was using 4 to 5 grams of methamphetamine, smoking it, and using 20 to 40 Lortab."

> FN41. Dr. Smith testified, "He thinks he's being attacked by all these people, and then this unfortunate altercation occurs." Dr. Smith also recounted Malone's perception "[t]hat he was under attack and that the dead body was coming after him."

*Malone*, 168 P.3d at 189–95.

## III.  Standard of Review.

### A.    Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.    Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"    *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

### C.    Merits.

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs the Court's power to grant relief.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision.  "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not

whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Relief is warranted only "*where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with* [the Supreme Court's] precedents." *Id.* (emphasis added). The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

## IV.  Analysis.

### A. Ground One:  Faulty Jury Instructions.

Petitioner claims that flawed jury instructions in his first trial violated his right to a fair trial and his right to present a defense. Petitioner further claims that the OCCA violated his due process rights by misapplying its plain error review to the claim on appeal.

Petitioner raised a voluntary intoxication defense. *Malone*, 168 P.3d at 196. The trial court determined that Petitioner had presented sufficient evidence of voluntary intoxication and instructed the jury as to that defense. *Id*. at 196-97. Defense counsel did not raise any objection to the instructions at trial. *Id*. at 197. On direct appeal, Petitioner claimed that the instructions were flawed and violated his right to a fair trial. *Id*. at 196. Because counsel did not object to the instructions at trial, the OCCA reviewed the claim for plain error. *Id*. at 197. The OCCA found the instructions legally incorrect: "the failure of [Petitioner's] jury instructions to accurately instruct his jury in this regard constitute[d] plain error." *Id*. at 201. The OCCA then evaluated whether the error was harmless beyond a reasonable doubt, applying the standard from *Chapman v. California*, 386 U.S. 18 (1967). *Id*. at 201 & n.68. The OCCA found that while Petitioner had presented evidence to warrant a voluntary intoxication instruction, the evidence as a whole showed no reasonable possibility that the jury would have accepted that defense, regardless of the instructions' accuracy. *Id*. at 201. Accordingly, the OCCA denied Petitioner relief.

Petitioner attacks the OCCA's decision on two fronts. First, he claims that the OCCA *itself* violated his constitutional rights by engaging in both plain error and harmless error reviews. Second, he claims that the error had a substantial and injurious effect on the jury's verdict.

### 1. *Exhaustion*.

Petitioner claims that since plain error review requires a finding of prejudice under Oklahoma law, any plain error is prejudicial by definition. Petition at 24-27. Petitioner

thus argues that the OCCA improperly engaged in two inconsistent prejudice inquiries by determining first that the instructional error was plain error but then finding the error harmless. *Id*. Petitioner claims that the OCCA's contradictory decision violated due process by depriving him of state procedural protections. Petitioner never raised this argument to the OCCA.

It is rare that a habeas petitioner bases an independent claim on an appellate court's actions. Usually petitioners attack the appellate court's treatment of the trial court's actions. But even where petitioners do raise claims against the appellate court, AEDPA's basic requirements—including exhaustion—still apply. Title 28, Section 2254(c) provides that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." Since Petitioner admits that he did not exhaust his claim against the OCCA in state court, the relevant inquiry is whether Petitioner had a right to raise those claims in state court by any procedure.

Petitioner argues that he could not have raised the issue in state court because he could not have foreseen that the OCCA would resolve his case as it did, and because "federal habeas is the exclusive forum" for him to challenge the OCCA's decision. Reply at 2. But the Court notes at least two paths by which Petitioner could have presented this claim to the OCCA. First, Petitioner could have raised this claim in a petition for rehearing. Rule 3.14 of the Rules of the Court of Criminal Appeals, Tit. 22, Ch. 18, App. allows rehearing when "[t]he decision is in conflict with an express statute

or controlling decision to which the attention of this Court was not called either in the brief or in oral argument." Since Petitioner argues that the OCCA's decision was in direct conflict with its plain error precedent, the claim would have been an appropriate one for rehearing. Second, Petitioner could have raised the claim in one of his three post-conviction proceedings, because it "could not have been raised in a direct appeal" and ostensibly supports a conclusion that the outcome of Petitioner's trial would have been different.[3] OKLA. STAT. tit. 22, §1089(C). In spite of these available procedures, Petitioner never presented this issue to the OCCA.

Petitioner may have believed that raising the issue would be futile, as he seems to indicate in his reply brief. If that were indeed Petitioner's position, he would still bear the burden of showing that exhaustion would have been futile because of "an absence of available State corrective process" or "circumstances…that render such process ineffective to protect [his] rights . . . ." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting 28 U.S.C. §§ 2254(b)(1)(B)(i), (ii)). The Court is satisfied that the avenues to address this issue existed, and Petitioner has not presented any substantial argument as to why those avenues were futile. Petitioner could have exhausted this claim, but did not.

The same is true for Petitioner's claim under *Beck v. Alabama*, 447 U.S. 625 (1980). Petitioner claims that the flawed instructions prevented the jury from fully considering his defense, thereby violating his right to have the jury consider the lesser

---

[3] The presumed argument would be that if the OCCA had not misconstrued the analysis, it would have found the error prejudicial, which would in turn support the conclusion that the outcome at trial would be different but for that error.

charge of second degree murder.  Petition at 31.  Respondent argues that Petitioner never raised this claim on direct appeal, while Petitioner claims he did.

Petitioners must "fairly present" their claims in state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1)(A).  A petitioner need not provide "book and verse on the federal constitution," but they must go beyond simply presenting the facts supporting the federal claim or articulating a "somewhat similar state-law claim."  *Bland v. Sirmons*,  459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard*, 404 U.S. at 278, and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  Instead, the petitioner must have raised the substance of the federal claim in state court.  *Id.*

Petitioner cites his appellate brief to argue that he exhausted this claim.  The relevant quote states that "had the jury been properly instructed, it could have found [him] guilty only of the lesser offense based on voluntary intoxication."  Appellant's Br. at 23, *Malone v. State*, No. D-2005-600.  This passing reference from his appellate brief does not fairly present a discrete *Beck* claim.  First, it is uncertain whether the facts even support a *Beck* claim, as *Beck* deals with the specific situation where a trial court refuses to give a second degree murder instruction.  *See Taylor v. Workman*, 554 F.3d 879, 893 (10th Cir. 2009) (discussing the difference between a *Beck* claim and a claim that the instructions given were flawed).  And even if flawed instructions raise an arguable *Beck* claim, the OCCA could not have reasonably been expected to recognize and pluck that claim from Petitioner's discussion of a completely different claim, especially when Petitioner never cited *Beck*.  The claim was not fairly presented and is therefore unexhausted.

## 2. *Procedural Bar.*

Generally, federal courts dismiss unexhausted claims without prejudice to allow the petitioner to raise the claim in state court. *Bland*, 459 F.3d at 1012. But when the state court would find the claim barred under an independent and adequate procedural bar, "there is a procedural default for purposes of federal habeas review." *Id.* (quoting *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992)). Oklahoma defendants cannot apply for post-conviction relief on issues that could have been raised "previously in a timely original application or in a previously considered application . . . ." OKLA. STAT. tit. 22, § 1089(D)(8). Petitioner could have raised his *Beck* claim and his claim against the OCCA in prior post-conviction applications or in a petition for rehearing, but failed to do so. Therefore, Oklahoma law would now bar those claims.

When a state court applies a state procedural bar, the petitioner must either show that the bar is inadequate or dependent on federal law, or provide a reason to excuse the default. *Cone*, 556 U.S. at 465; *Coleman*, 501 U.S. at 750. A procedural bar is adequate if it is "strictly or regularly followed and applied evenhandedly to all similar claims." *Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th Cir. 2009) (internal quotation marks omitted). The bar is independent if "it relies on state law, rather than federal law, as the basis for the decision." *Banks v. Workman*, 692 F.3d 1133, 1145 (10th Cir. 2012). A petitioner can still avoid an adequate and independent procedural bar by establishing either cause for the default and actual prejudice from the alleged violation of federal law,

or that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Petitioner generally argues that Oklahoma's procedural bar is not independent of federal law because the OCCA has discretion under *Valdez v. State* to grant relief when "an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 46 P.3d 703, 710 (Okla. Crim. App. 2002). Petitioner claims that determining whether the error resulted in a miscarriage of justice or constituted a substantial violation necessarily includes consideration of the claims' merits. The Tenth Circuit has rejected this argument several times in recent years. *See Fairchild v. Trammell*, 784 F.3d 702, 719 (10th Cir. 2015); *Banks v. Workman*, 692 F.3d 1133, 1145-46 (10th Cir. 2012); *Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012). Oklahoma's bar is adequate and independent of federal law.[4]

Petitioner also argues that appellate counsel ineffectiveness serves as cause to excuse the default. Ineffective assistance of appellate counsel can only serve as cause if the defendant raised that ineffective assistance claim in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Petitioner did not raise any ineffectiveness claims based on his unexhausted *Beck* claim or his claim against the OCCA in state court. Since Petitioner cannot establish cause to excuse the default of these claims, they are procedurally barred.

---

[4] The Petitioner's general attack on the procedural bar also claims that it is inadequate regarding to procedures for raising extra-record ineffectiveness claims on direct appeal. That argument has no relevance in relation to these unexhausted claims.

### 3. *Exhausted Claim.*

The only exhausted claim in Petitioner's first ground is his claim that the flawed jury instructions violated his right to a fair trial. Petitioner argues that the instructional errors were harmful and that the OCCA's decision was based on an unreasonable determination of facts. Petitioner's main contention is that the OCCA erred by applying two levels of prejudice analysis to this claim. Petitioner argues that this analysis is contrary to both state and federal law. Regardless of whether that contention is accurate, this argument is not relevant to whether Petitioner is entitled to habeas relief.

Title 28, U.S.C. Section 2254(d)(1) states that habeas relief is warranted where "the adjudication of the [habeas] claim…resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." The language of the statute focuses on the resulting decision, not the analysis leading to the decision. *See Neal v. Puckett*, 286 F.3d 230, 244-46 (5th Cir. 2002) (discussing the AEDPA standard and concluding that the focus is on the ultimate legal conclusion, not the state court's method of arriving at the conclusion). The Court is therefore concerned only with the OCCA's decision that the instructional error was harmless.

While Petitioner addresses that decision, he primarily focuses on the OCCA's plain error review. But plain error review is merely a state-law avenue for the OCCA to consider alleged errors that were not raised at trial. *Simpson v. State*, 876 P.2d 690, 700 (Okla. Crim. App. 1994). Federal habeas courts do not review how the OCCA decides it can address a waived issue, but rather look to the substantive treatment of that issue. Here, the OCCA determined under its plain error review that the instructional issue was

the type of error that the OCCA could address despite the lack of objection at trial. The OCCA then made the substantive determination that the error was harmless beyond a reasonable doubt. The Court's only concern is whether the error was harmless for habeas purposes.

Petitioner's citations to *Kyles v. Whitley* and *Byrd v. Workman* do not alter the analysis. In both cases, the question was whether an error could be harmless where prejudice was a substantive element of the claims. In *Kyles*, the Supreme Court discussed harmless error analysis for errors under *United States v. Bagley*, 473 U.S. 667 (1985). 514 U.S. 419, 435 (1995). *Bagley* dealt with prosecutors' responsibility to produce to the defense evidence favorable to their case. *Id.* at 433. The Supreme Court concluded that because a *Bagley* error required a finding of "a reasonable probability that, had the [favorable] evidence been disclosed to the defense, the result of the proceeding would have been different," any further harmless error analysis would be unnecessary. *Id.* at 433-35 (quoting *Bagley*, 473 U.S. at 682). In *Byrd v. Workman*, the Tenth Circuit followed this same logic in determining that the harmless error analysis was irrelevant when a petitioner established a claim for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because prejudice is one of the elements of that claim. 645 F.3d 1159, 1167 n.9 (2011). *Kyles* and *Byrd* do not support Petitioner's argument because in both cases, the types of errors involved could not be harmless by definition. The substantive claim in this case, flawed instructions, *is* subject to the harmless error analysis. *See Turrentine v. Mullin*, 390 F.3d 1181, 1191 (10th Cir. 2004) (applying harmless error standard in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)

to a claim of erroneous jury instructions). It is not a claim that, by definition, cannot be harmless. That the procedural vehicle for raising the claim in state court includes a prejudice element is irrelevant for habeas purposes, as the OCCA's plain error review simply allows a petitioner's foot in the door; it is not a substantive claim that is impervious to harmless error analysis.[5] The OCCA's procedural findings that enabled its review of the instructional issue are beyond the scope of this Court's authority under AEDPA. Therefore, this Court will only decide whether the error was, in fact, harmless under the prevailing habeas standards.

### 4. *Harmless Error.*

Habeas courts generally ask whether the state court's decision was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C., § 2254(d)(1). But because the AEDPA is designed to limit habeas review rather than expand it, the Supreme Court has determined that when analyzing whether an error is harmless, federal courts should apply the more forgiving test set out in *Brecht* rather than the general unreasonableness test under AEDPA. *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Therefore, when a state court finds that an error is harmless under *Chapman*, federal habeas courts must determine if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 116 (quoting *Brecht*, 507 U.S. at 637 (1993)); *Littlejohn v. Trammell*, 704 F.3d 817, 833-34 (10th Cir. 2013). This standard is

---

[5] While the OCCA's handling of plain error review is irrelevant to the underlying substantive claim, the Court still notes that Petitioner's argument on that subject appears shaky. The OCCA has explained in two other cases that plain error does not mean reversible error, indicating that plain error can, in fact, be harmless under Oklahoma law. *See Primeaux v. State*, 88 P.3d 893, 907 (Okla. Crim. App. 2004); *Simpson*, 876 P.2d at 700-01.

mandated by the "[i]nterests of comity and federalism, as well as the State's interest in the finality of convictions that have survived direct review within the state court system." *Littlejohn*, 704 F.3d at 834. To grant relief, the reviewing court must have grave doubts as to the error's effect on the verdict, and if the court is in "virtual equipoise as to the harmlessness of the error," the court should "treat the error…as if it affected the verdict." *Selsor*, 644 F.3d at 1027 (quoting *Fry*, 551 U.S. at 121 n.3).

Having reviewed the trial record, the Court concludes that the erroneous instructions in this case did not have a substantial or injurious effect on the jury's verdict. It is true that Petitioner presented evidence that would indicate he was under the influence of methamphetamine and prescription drugs on the night he murdered Trooper Green. It is also true Petitioner testified he was hearing voices at the time he murdered Trooper Green. 2005 Trial Tr. vol. 4 at 908-11.[6] Petitioner's expert testified about the possible psychotic effects of methamphetamine use and opined that Petitioner could not form the intent to commit first degree murder. *Id*. at 1066-67, 1099.

But this evidence pales in comparison to the evidence at trial showing that Petitioner was lucid and calculating. The prosecution established through testimony that other witnesses could not recall Petitioner suffering from hallucinations. The prosecution emphasized that the only evidence of Petitioner's visual and auditory hallucinations came from Petitioner himself. There was also some question as to whether Petitioner had actually taken a significant amount of drugs on the day of the murder. The prosecution presented testimony from officers who encountered Petitioner shortly after the murder

---

[6] Because Petitioner had two trials, the trial transcripts are distinguished by the year of the trial.

and who testified that he appeared normal, showing no signs of methamphetamine intoxication or sleeplessness. 2005 Trial Tr. vol. 5, 1181-82, 1188-90. Petitioner's expert admitted that Petitioner's actions immediately before and after the murder were logical and goal-oriented. 2005 Trial Tr. vol. 4, 1137-42, 1146-50. And the evidence most damning to the voluntary intoxication defense was the Dashcam video depicting the moments leading up to Trooper Green's murder. Although the video does not visually show the murder, it presents audio of Petitioner's and Trooper Green's conversation. Petitioner is heard interrogating Trooper Green about the location of a key, presumably to the handcuff that Trooper Green placed on Petitioner's wrist. 2005 Ct's Ex. 9 at 2-3. Petitioner repeatedly commands Trooper Green to keep his hands out. *Id*. at 3-6. Petitioner even tells Trooper Green he would shoot him if he moved. *Id*. at 5. After unsuccessfully searching Trooper Green for the keys, Petitioner decides he no longer needed them. *Id*. at 6. While Trooper Green prays and begs for his life, Petitioner pulls the trigger twice and flees. *Id*. The video depicts Petitioner's clearheaded discussion with Trooper Green and his eventual decision to shoot him in the head. Petitioner's own testimony confirmed that he purposefully shot Trooper Green in the head to "keep him down" and "[t]o make sure he don't [sic] get up." 2005 Trial Tr. vol. 4, 1002-03.

This evidence shows that the faulty voluntary intoxication instructions did not have a substantial and injurious effect or influence on the verdict. The jury heard that Petitioner engaged in logical, goal-oriented behavior before and after the murder. The jury heard the logical, lucid, and calculating Petitioner searching for the keys to the handcuffs and vigilantly telling Trooper Green to stay still and keep his hands out. The

jury heard that Petitioner put the gun to Trooper Green's head and pulled the trigger to make sure he did not get up. The Court has no doubt that the jury would have rejected the voluntary intoxication defense, even with thorough and accurate instructions.

Petitioner contends that the OCCA's decision was based on an unreasonable determination of facts because the OCCA found that Petitioner presented sufficient evidence to be entitled to the instruction but also held that no reasonable jury could accept the defense. This is not inconsistent. A prima facie case is one that is established in the absence of conflicting evidence. *See* BLACK'S LAW DICTIONARY 598 (8th ed. 2004). In other words, assuming everything that Petitioner presented was true, he would be entitled to the voluntary intoxication defense. The OCCA found that Petitioner met that low threshold. But when determining whether the instructional error was harmless, the OCCA did not assume the veracity of Petitioner's evidence but instead considered the entire record, and found that Petitioner's arguments wilted before the overwhelming evidence to the contrary.

Petitioner also points to *Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009) to argue that the error was harmful. In *Taylor*, the trial court gave an erroneous second degree murder instruction that precluded the jury from convicting the petitioner of second degree murder if they found that he intended to kill or harm the victim. *Id*. at 893. The erroneous inclusion of the term "harm" was not harmless in that case, because the petitioner's entire defense rested on his claim that he intended only to shoot the victim, not kill him. *Id*. By its very terms, the instruction absolutely precluded the defense based

on the petitioner's own evidence, therefore the Tenth Circuit found the error harmful. *Id*. at 893-94.

This case is distinct from *Taylor*, because the erroneous instructions in this case did not preclude Petitioner's defense. Nor did it prevent the jury from finding that Petitioner was intoxicated and therefore unable to commit first degree murder. Instead, it injected confusion into the instructions and created potential for misunderstanding. But the potential misunderstanding was dwarfed by the reality that even with proper instructions, the evidence presented firmly established that Petitioner was not intoxicated to the point of negating criminal intent. The faulty jury instructions did not have a substantial and injurious effect or influence on the jury's verdict. Relief is denied as to Ground One.

## B. Ground Two: Ineffective Assistance of Resentencing Trial Counsel.

Petitioner claims that his resentencing trial counsel was ineffective for (1) advising him to waive jury sentencing, (2) failing to argue that his mitigating circumstances outweighed the aggravating circumstances during closing argument, and (3) failing to investigate and present evidence that Petitioner was sexually abused as a child. Petition at 38-39. Petitioner raised the waiver and closing argument issues on direct appeal. *Malone*, 293 P.3d at 207, 209. Petitioner claimed that the decision to waive a jury trial was unreasonable because a community survey showed that the jury pool in the county where he was tried was open to a sentence less than death. *Id*. at 208. Petitioner also alleged that the judge was under political pressure to return a death sentence and had heard the inadmissible and prejudicial evidence from Petitioner's first trial. *Id*. at 209.

Petitioner argued that these factors rendered the decision to waive a jury trial objectively unreasonable. *Id*. at 208-09. Petitioner claimed that counsel's closing argument was deficient because counsel did not argue that the mitigating factors outweighed the aggravating factors and he did not advocate for life in prison. *Id*. at 209. The OCCA denied relief on both the waiver and closing argument claims. *Id*.

Petitioner raised the jury trial issue again in his third application for post-conviction relief. *Malone*, No. PCD-2014-969, slip op. at 8. Petitioner added the argument that counsel's advice was unreasonable due to Petitioner's fragile mental state. *Id*. at 9. It was in this third application that Petitioner also raised the sexual abuse claims for the first time. *Id*. at 4. The OCCA held that the new competency argument and sexual abuse claims were waived. *Id*. at 4, 9-10.

### 1. *Procedural Bar*.

The OCCA applied a state procedural bar to Petitioner's sexual abuse and competency claims, although it provided a related merits analysis on each. "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)). But state courts can "look to federal law…as an alternative holding while still relying on an independent and adequate state ground" for denial of a claim. *Coleman*, 501 U.S. at 733. In those situations, federal courts "must acknowledge and apply the [state court's] procedural bar ruling, even though the [state court], on an alternative basis, briefly addressed and

rejected the merits of [the petitioner's] claim." *Thacker v. Workman*, 678 F.3d 820, 834 n.5 (10th Cir. 2012).

While Petitioner argues that the OCCA did not clearly and expressly apply the procedural bar to his sexual abuse and competency arguments, he is simply injecting ambiguity where none exists. The OCCA specifically addressed Petitioner's trial and appellate counsel ineffectiveness claims related to the alleged sexual abuse and noted that he had "not shown that these claims were not available or ascertainable through the exercise of reasonable diligence on or before the filing of his original application for post-conviction relief." *Malone*, No. PCD-2014-969, slip op. at 4. The OCCA observed that Petitioner raised an ineffective assistance of post-conviction counsel claim to excuse the fact that "he has waived these claims." In discussing the waived trial and appellate ineffectiveness claims, the OCCA cited Okla. Stat. 22, § 1089(C)(1), (D)(8), which details the OCCA waiver rule. *Id*. The OCCA did address the merits of the post-conviction ineffectiveness claim to determine whether post-conviction counsel's ineffectiveness could excuse the default of the underlying trial and appellate counsel claims.

The OCCA also clearly and expressly relied on the procedural bar with regarding Petitioner's competency argument. The OCCA noted that the jury trial claim was raised previously, but pointed out that Petitioner "further assert[ed] that counsels' advice was unreasonable in light of the issues surrounding his competency." *Id*. at 8-9. One paragraph later, the OCCA barred the jury trial claim under *res judicata*, but specifically noted that "we find the portion of his argument which he had not heretofore presented is

waived." *Id*. at 9-10. Petitioner claims that the OCCA was unclear as to which portion of the claim was procedurally barred. But the OCCA clearly identifies what portion of the claim was new and specifically applied the procedural bar to that portion. The OCCA clearly and expressly barred both claims under a state procedural rule.

The Court has already considered and rejected Petitioner's general argument that Oklahoma's procedural bar is not independent. *Supra* p. 21. But Petitioner also challenges the adequacy of the procedural bar regarding the ability to raise ineffective assistance of counsel claims on direct appeal. Petitioner argues that Oklahoma's ineffectiveness standard is more demanding than the *Strickland* standard and therefore does not provide an adequate opportunity to raise those issues on direct appeal. Petition at 95-96. This argument is irrelevant, however, because the OCCA barred these claims based on Petitioner's failure to raise them in a previous post-conviction application, not direct appeal. *Malone*, No. PCD-2014-969, slip op. at 4, 9-10.[7] Petitioner fails to show that the procedural bar is dependent on federal law or is inadequate regarding these claims.

Petitioner's remaining argument is that appellate and post-conviction counsel ineffectiveness can excuse the procedural default. This argument also fails. Regarding his competency argument related to his waiver claim, Petitioner never raised an ineffective assistance of appellate or post-conviction counsel claim in state court on that

---

[7] Even if this argument were relevant, it is precluded by Tenth Circuit precedent. *See Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013) (the OCCA has made it clear that its standard for ineffectiveness on direct appeal is intended to be less demanding than *Strickland*).

issue. An unexhausted ineffectiveness claim cannot excuse a procedural default. *Edwards*, 529 U.S. at 451-52.

Petitioner's sexual abuse claim fares no better. While Petitioner did raise an appellate ineffectiveness claim in his third post-conviction proceeding, the OCCA considered that claim waived. *Malone*, No. PCD-2014-969 slip op. at 4. *Edwards v. Carpenter* clearly states that procedurally defaulted claims cannot themselves excuse other defaulted claims, absent an independent showing of cause and actual prejudice. 529 U.S. at 452-53.

Petitioner tries to salvage his defaulted trial and appellate ineffectiveness claims through an ineffective-assistance-of-post-conviction-counsel claim. However, ineffective assistance of post-conviction counsel cannot serve as cause since there is no constitutional right to counsel in state post-conviction proceedings. *Coleman*, 501 U.S. at 752. And although Petitioner cites *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to argue that sometimes post-conviction counsel ineffectiveness can serve as cause, *Martinez* is not applicable to Petitioner. *Martinez* allowed a narrow exception for post-conviction ineffectiveness to serve as cause *only* when a defendant's first opportunity to raise an ineffective-assistance-of-trial-counsel claim is in an initial collateral proceeding. *Id*. at 1319-20. *Martinez* does not apply to attorney errors "in any proceeding beyond the first occasion the State allows a prisoner raise a claim of ineffective assistance at trial . . . ." *Id*. at 1320. *Martinez* does not allow Petitioner to claim ineffective assistance of post-conviction counsel, because Oklahoma law allows defendants a meaningful opportunity to raise ineffective-assistance-of-trial-counsel claims on direct

appeal under OCCA Rule 3.11. *See Fairchild*, 784 F.3d at 723; *Banks*, 692 F.3d at 1148. Therefore post-conviction counsel's errors are beyond *Martinez's* reach.

Petitioner also states, without much legal support, that post-conviction ineffectiveness can serve as cause because he has a state law right to post-conviction counsel. Since the Supreme Court has explicitly stated that the errors of post-conviction counsel "cannot be constitutionally ineffective" and that defendants must bear the risk of post-conviction errors that result in a procedural default, the Court does not credit this argument. *Coleman*, 501 U.S. at 752-53.

Petitioner cannot establish any reason for this Court to excuse the default of these claims. Therefore, Petitioner's ineffectiveness claims regarding sexual abuse and competency related to his waiver of jury resentencing are denied as procedurally barred.

### 2. *Clearly Established Law.*

The remaining claims are subject to the standard set out in *Strickland v. Washington*, which states that counsel is constitutionally ineffective when counsel's deficient performance prejudices the defense. 466 U.S. at 687. On habeas review, courts must apply the *Strickland* and AEDPA standards to the facts of the case and decide whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 101, 105. Federal courts cannot disturb a state court's ruling unless the petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fairminded jurist would agree was incorrect. *Id*.

Courts analyze counsel's performance for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court shuns specific guidelines for measuring deficient performance, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel, or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. Instead, courts must be highly deferential when reviewing counsel's performance, and the petitioner must overcome the presumption that the "challenged action[s] might be considered sound trial strategy." *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted).

Even if a petitioner shows deficient performance, he must also show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

**3.** *Analysis.*

a. *Advising Petitioner to waive jury sentencing.*

After the OCCA reversed Petitioner's first death sentence and remanded the case to Comanche County, Petitioner's resentencing counsel set about to determine whether Petitioner could receive a fair trial in that county. Counsel was especially concerned with the ongoing media coverage in the area. To determine the effect of the coverage on the jury pool, counsel commissioned a survey of the jury pool in Comanche County. O.R. 6 at 1118-19. Citing the survey and media coverage, counsel requested transfer of the case to a different county. *Id*. at 1106. The trial court denied the request. Mot. Hr'g Tr. 12-13, Sep. 24, 2010.

After the trial court denied the motion, a local newspaper published a prejudicial article that led the trial court to seal the court file. Mot. Hr'g. Tr. 2-4, Oct. 8, 2010. Counsel then decided to ask for a continuance because of the negative pretrial publicity. *Id*. at 2. But at the hearing on the motion for a continuance, defense counsel informed the trial court that rather than seeking a continuance, Petitioner had decided to proceed with a bench trial. *Id*. at 5-6. Counsel explained that they had discussed the issue with Petitioner and had given him a day to consider the options. *Id*. at 5. Petitioner testified that counsel did not try to influence him one way or the other, and he had the benefit of hearing different viewpoints from his attorneys and investigators. *Id*. at 19, 29. The trial court and defense counsel questioned Petitioner at length, and the trial court even indicated that it would likely grant a continuance if Petitioner desired to proceed with a jury trial. *Id*. at 18. Petitioner still opted to be sentenced by a judge rather than a jury.

Petitioner now claims that his resentencing trial counsel was ineffective for advising him to waive jury sentencing. Petitioner argues that because the trial court judge was the same judge that presided over his first trial, he was tainted by the inadmissible and prejudicial evidence that caused Petitioner's first death sentence to be reversed. Petitioner also contends that the survey conducted in Comanche County showed that a jury would be open to voting for a sentence less than death. Petitioner claims that these facts render counsel's strategic decision to waive jury sentencing objectively unreasonable.

"An attorney's decision to waive his client's right to a jury is a classic example of a strategic trial judgment, 'the type of act for which *Strickland* requires that judicial

scrutiny be highly deferential.'" *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995) (quoting *Green v. Lynbaugh*, 868 F.2d 176, 178 (5th Cir. 1989)) *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001). It is not enough for a petitioner to show that the decision was wrong, instead the decision to waive a jury must be "objectively unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Id*.

Petitioner's arguments fail to satisfy this highly deferential standard. As an initial matter, it is not apparent that Petitioner's counsel actually advised him to waive jury sentencing. The trial record supports the OCCA's observation that "[t]he defense team did not try to influence [Petitioner] one way or the other." *Malone*, 293 P.3d at 207. But even if Petitioner's attorneys did advise him to waive jury sentencing, he still fails to show that the OCCA's determination that his attorneys acted reasonably was itself unreasonable.

Petitioner's non-barred arguments focus on the trial judge's previous exposure to improper evidence, and the results of the jury survey. Neither argument establishes that counsel's decision was objectively unreasonable. Petitioner's counsel had serious concerns about selecting a jury in Comanche County. Having failed to have the case transferred, they faced the reality of going to trial with a jury that had likely been exposed to a great deal of publicity about the crime and Petitioner. Because the jury would also be one that had not seen the evidence in the previous trial, they would likely be enthralled by the horrifying and emotional aspects of the case. The judge, already familiar with the crime, would likely be less distracted by those aspects than a jury that was hearing the

evidence for the first time. And even though the judge previously heard improper victim impact evidence, "judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera*, 454 U.S. 339, 346 (1981). Counsel could reasonably believe that although the judge had heard the improper evidence, he could still put it aside and focus on the evidence presented. Even if counsel's belief was wrong, the Court cannot say that counsel's view was objectively unreasonable.

Petitioner's argument about the survey is likewise unconvincing. Petitioner highlights the results from two questions in a twenty-two question survey. One question asked about the likelihood that Petitioner could receive a sentence less than death in Comanche County. O.R. 6 at1152. The responders, at a rate of 23.4%, said it was very likely that Petitioner would receive a lesser sentence; 33.8% said somewhat likely; 16.7% said somewhat unlikely; 17.4 % said very unlikely, and the rest did not know or did not answer. *Id.* Petitioner claims that since 57.2% of responders thought it was very likely or somewhat likely that a jury would recommend a sentence less than death, counsel should not have opted for a bench trial.

This question and the responses to it fail to establish that counsel acted unreasonably. While the "very likely" answers may have indicated an ability to seat an impartial and fair jury, the "somewhat likely" responses seem less persuasive, as they indicate that the responder is not actually sure that Petitioner could get a sentence less than death. Read as a whole, the responses indicate that 67.9% of responders harbored at least some doubt that Petitioner could have a jury that would *possibly* return a sentence less than death. The ambiguity of the responses is magnified when considered with the

vagueness of the question itself. The Court is not convinced that this question and the responses to it undermine the reasonableness of counsel's decision.

The second question asked what punishment responders thought was appropriate for Petitioner. O.R. 6 at 1150. Petitioner points out that 42% of the responders opted for either a life sentence or life without the possibility of parole. While those responses have a slight edge over those that preferred death (40%), this comparison does not support Petitioner's argument. The results show that without having heard a shred of evidence, 40% of the responders thought death was the appropriate sentence. The prosecution bears the burden in sentencing to prove aggravating factors beyond a reasonable doubt, and a criminal defendant is not even eligible for death in Oklahoma unless the prosecution meets that burden and shows that the aggravating circumstances outweigh the mitigating circumstances. Yet the survey revealed that a large swath of the jury pool preferred the sentence of death before the trial even began. Counsel could reasonably be underwhelmed by the number of responses for a lesser sentence and rightly concerned with the responses that showed nearly half of the responders had formed an opinion favoring a death sentence. Based on counsels' information regarding the jury pool and the judge, the Court cannot say that counsel was unreasonable for advising Petitioner that a bench trial would be a better option.

Even if counsel's strategy was unreasonable, Petitioner fails to show prejudice. Petitioner makes a general argument that his extensive mitigation case could have swayed one juror to reject a death sentence. But the "reasonable probability" that one juror would have struck a different balance must be "substantial, not just conceivable."

*Grant v. Trammell*, 727 F.3d 1006, 1018-19 (10th Cir. 2013). Petitioner's general argument does not meet that standard. Petitioner also argues that during formal sentencing, the trial judge must have been considering the fact that a previous jury had sentenced Petitioner to death because the judge said "[t]he Court, having previously sentenced you to death upon a conviction of first degree murder by a prior jury, Mr. Malone, hereby sentences you to death by lethal injection." Petition at 44. But this cherry-picked statement does not mean what Petitioner thinks it means. The trial judge had pronounced the verdict earlier in the hearing, stating that "the defendant having been convicted of first degree murder, is hereby sentenced to death." Sentencing Hr'g Tr. 3, Nov. 1, 2010. The trial court then went into formal sentencing, at which point the judge made the statement above. *Id*. at 4. The structure of the statement and the context suggests that the judge meant that the *trial court* had previously sentenced Petitioner to death, not the prior jury. The reference to the prior jury went to the conviction, not the sentence. The plain reading shows that the judge was not sentencing Petitioner while considering the prior jury's sentence, but was rather giving an accurate procedural summary. That statement does not give any indication that Petitioner suffered prejudice from the waiver of jury sentencing.

Counsel did not act unreasonably, and Petitioner did not suffer any prejudice from the waiver of jury sentencing. The OCCA's decision was therefore reasonable and relief is denied on that issue.

b. *Closing argument.*

Petitioner's counsel delivered a closing argument that focused on Petitioner's past, his good character, his mental illness, and his addictions. 2010 Trial Tr. vol. 10, 22-24. Counsel listed out the seventeen mitigating factors, but said that he would not go through every piece of evidence supporting those factors. *Id*. at 25-27. Counsel then discussed justice and what it would mean in Petitioner's case. *Id*. at 27-28. Counsel ended his argument by claiming that death would be the merciful sentence because Petitioner would no longer suffer, and rather than bringing back the victim, a death sentence would only create more victims. *Id*. at 28-30. Petitioner claims that counsel's closing argument was deficient because he did not argue that the mitigating circumstances outweighed the aggravating circumstances or advocate for life. The OCCA found that although counsel's strategy was ultimately unsuccessful, it was not unreasonable.

An attorney's handling of closing arguments is considered a strategic decision, and is therefore afforded great deference. *See Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (decision to waive closing argument is a commonly adopted strategy); *Moore v. Gibson*, 195 F.3d 1152, 1179-80 (10th Cir. 1999) (counsel's concessions during closing were presumed sound trial strategy). Affording counsel's strategic decisions the proper deference under *Strickland* and reviewing the OCCA's decision under AEDPA, the Court cannot say that the OCCA was unreasonable in finding that Petitioner's counsel acted reasonably.

As opposed to an argument before a jury, counsel had the benefit of a fact-finder who thoroughly understood the sentencing process. Counsel could have reasonably

assumed that the trial court knew what to do with the mitigating and aggravating circumstances and that it was unnecessary to waste time pointing out that the latter outweighed the former. And counsel also did not leave the record silent on the mitigating factors. Counsel listed the seventeen factors set out in the instructions. 2010 Trial Tr. vol. 10, 24-27. These factors were not general and nonspecific, but were instead a detailed list of persuasive reasons for the judge to reject a death sentence. Counsel likely decided not to go into the details of the evidence because the summary was so comprehensive.

Also, counsel's decision to portray death as the merciful option is not unreasonable. Counsel faced a situation where two aggravators were clearly supported. And the mitigation case, while thorough, was not likely to outweigh the overwhelming evidence in aggravation. Counsel therefore sought to save his client's life by arguing that justice demanded life in prison. Counsel characterized death as the easy way out for Petitioner, suggesting that life imprisonment would actually be the more punitive sentence. Counsel's framing of the issue may not have been typical, but it was not objectively unreasonable. Petitioner has failed to rebut the presumption that counsel's closing argument was the result of sound trial strategy, therefore the OCCA's decision that counsel acted reasonably is also reasonable.

Petitioner also cannot show that any deficiency in the closing argument prejudiced his defense. The judge knew that Petitioner sought to avoid the death penalty. The judge knew that death was off of the table if the mitigating factors outweighed the aggravating

factors. There is no reasonable probability that a different approach by counsel would have swayed the judge's decision.

**4. *Conclusion*.**

Petitioner's argument that counsel should not have advised him to waive his jury sentencing while he was in a fragile mental state is denied as procedurally barred. The Court also denies Petitioner's claim that counsel should have uncovered and presented evidence of sexual abuse, as that claim is barred as well. Regarding the jury trial waiver and closing argument claims, Petitioner fails to show that counsel acted unreasonably or that he suffered prejudice due to counsel's actions. Therefore, the Court concludes that the OCCA's handling of those claims was reasonable. Relief is denied on Ground Two.

**C. Ground Three: Ineffective Assistance of Guilt-Stage Counsel.**

Petitioner claims that trial counsel was ineffective during the guilt stage of his first trial. First, Petitioner claims that counsel inadequately prepared for the case, particularly by failing to arrange for Petitioner to meet with the mental health expert until midway through the trial. Second, Petitioner claims that counsel failed to object to the faulty voluntary intoxication instructions. The OCCA denied these claims on direct appeal, finding that although counsel acted unreasonably in both instances, neither mistake prejudiced the defense. *Malone*, 168 P.3d at 219-21.

**1. *Clearly Established Law*.**

Counsel is constitutionally ineffective if their deficient performance prejudices the defense. *Strickland*, 466 U.S. at 687. When it is easier to dispose of an ineffectiveness claim for lack of prejudice without addressing the reasonableness of counsel's

performance, that is the course that federal courts should, and often do, take. *See McGee v. Higgins*, 568 F.3d 832, 839 (10th Cir. 2009) (quoting *Strickland*, 466 U.S. at 697). For that reason, the Court does not need to evaluate the OCCA's analysis on whether counsel acted unreasonably, because Petitioner fails to show prejudice.

### 2. *Analysis.*

Petitioner's counsel approached the trial laboring under a key misconception: they believed that Petitioner did not remember anything about the murder. 2005 Trial Tr. vol. 4, 882. But when Petitioner met with the defense expert for the first time midway through the trial, Petitioner revealed that he did remember the murder, but his previous attorney told him never to tell anyone. *Id*. at 883. Based on that revelation, counsel asked to add an insanity defense, a request that the trial court denied. *Id*. at 891.[8] When the defense expert testified, the prosecution called much of his testimony into question, including his ultimate opinion that Petitioner did not possess the necessary mental state to be guilty of first degree murder. Before closing arguments, the judge instructed the jury on voluntary intoxication, using the faulty instructions discussed in Ground One. The jury found Petitioner guilty of first degree murder.

Petitioner argues that the late revelations from the interview undermined Petitioner's voluntary intoxication defense and made the defense expert vulnerable to a devastating cross examination. Doubtless counsel had to scramble to salvage their defense, and the expert did struggle to explain how Petitioner's intoxication affected his mental processes. But these facts alone do not establish that the OCCA's finding of no

---

[8] The trial court still instructed the jury on the insanity defense. O.R. 3 at 519.

prejudice was unreasonable. Petitioner does not claim that he could have presented any other defense besides voluntary intoxication. It appears that voluntary intoxication was Petitioner's only viable defense to first degree murder. As noted in Ground One, that lone defense was soundly and comprehensively overwhelmed by the prosecution's evidence. The jury heard that Petitioner engaged in logical behavior before, during, and after the murder. The jury watched the Dashcam video that captured Petitioner's words and conversation leading up to the fatal gunshots. Petitioner does not point to any new or different facts or theories that, had the expert met with Petitioner earlier, could have been presented to counter the avalanche of damning evidence. While Petitioner's case may have been stronger, more coherent, or less susceptible to impeachment, there is no reasonable probability a single juror would have been swayed away from the guilty verdict if counsel had invested more preparation and investigation.

Petitioner's ineffectiveness claim regarding counsel's failure to object to the faulty voluntary intoxication instructions fails for the same reasons. The Court has already determined that the faulty instructions amounted to harmless error due to the significant evidence undermining the voluntary intoxication defense. There is no reasonable probability that, had counsel objected and proper instructions been given, one juror would have accepted Petitioner's voluntary intoxication defense. Because Petitioner fails to show that the OCCA's finding of a lack of prejudice is unreasonable, the Court denies relief on Ground Three.

**D. Ground Four: Duplicative Aggravating Circumstances.**

After his resentencing trial, the trial court found that the prosecution had proved two aggravating circumstances: "[t]hat the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution . . . and that the victim of the murder was a peace officer as defined by Section 99 of Title 21 of the Oklahoma Statutes and that such a person was killed while performing official duties." Sentencing Tr. 2, Nov. 1, 2010. Petitioner claims that these two aggravating circumstances are unconstitutionally duplicative because the prosecution was able to use the fact that Petitioner killed Trooper Green to prove both aggravators. Petition at 75. Petitioner argues that these circumstances show that the aggravators impermissibly subsume each other. Petitioner raised this claim in his original direct appeal and his direct appeal from resentencing. The OCCA rejected the claim in both appeals. *Malone*, 293 P.3d at 216; *Malone*, 168 P.3d at 215-16.

### 1. *Clearly Established Law*.

Invalid sentencing factors can skew the sentencing analysis in states like Oklahoma, where the aggravating circumstances are weighed against the mitigating circumstances. *Stringer v. Black*, 503 U.S. 222, 231-32 (1992). Invalid factors have the potential to improperly place a thumb on the death side of the scale. *Id*. at 232. The Tenth Circuit found improper skewing in *United States v. McCullah*, where some of the aggravating factors subsumed the others, resulting in essentially the double-counting of the same aggravator. 76 F.3d 1087, 1111-12 (10th Cir. 1996). But the Supreme Court later addressed this theory in *Jones v. United States* and stated that it had "never before

held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in *McCullah* . . . ." 527 U.S. 373, 398 (1999). The Supreme Court emphasized that while *Stringer* said that "the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor," *McCullah's* reasoning "would have us reach a quite different proposition—that if two aggravating factors are 'duplicative,' then the weighing process necessarily is skewed, and the factors are therefore invalid." *Id*. The Supreme Court did not adopt the duplicative aggravator theory. *Id*.

### 2. *Analysis.*

Petitioner's claim fails at the outset because he cannot show that the OCCA's rejection of this claim is contrary to or an unreasonable application of clearly established federal law. *Jones* does not mince words: the Supreme Court has not addressed this question. And circuit precedent does not suffice to clearly establish a legal principle for habeas purposes. *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012). That leaves Petitioner's claim bereft of supporting authority.

Assuming that Petitioner's claim did relate to a legal theory supported by Supreme Court precedent, it still fails. The relevant test for duplicative aggravators under Tenth Circuit precedent is whether one factor "necessarily subsumes" the other. *Patton v. Mullin*, 425 F.3d 788, 809 (10th Cir. 2005) (quoting *Fields v. Gibson*, 277 F.3d 1203, 1218-19 (10th Cir. 2002)). Factors are not duplicative simply because they rely on some of the same evidence. *Id*. However, the Tenth Circuit has observed that the use of

different evidence for different aggravators can show that the aggravators do not subsume each other. *See Fields*, 277 F.3d at 1219.

Neither of these aggravating factors subsumes the other. First, viewing the aggravators generally without reference to the facts in this case, each of the aggravators can be established independently without establishing the other.[9] For instance, it is entirely possible for a criminal to kill a peace officer while not trying to avoid arrest. In fact, senseless blitz attacks on patrolling officers are a tragic reality. In those cases, the attacker is in no danger of being arrested or prosecuted prior to the murder. They apparently kill the officers solely to kill an officer. Thus, murder of a peace officer is not an aggravating factor that encompasses or subsumes the avoid arrest aggravator.

The avoid arrest aggravator likewise does not subsume the factor of murdering a peace officer. A murder to avoid arrest can target victims other than an actual police officer making an arrest. That aggravator is often applied to criminals who murder eyewitnesses, as killing an eyewitness certainly aids in avoiding arrest or prosecution. These aggravators are separate and distinct in their structure and the conduct they seek to address, and therefore do not necessarily subsume each other.

Second, the Court finds persuasive the fact that the evidence proving one aggravator in this case does not necessarily prove the other. Petitioner argued in his first trial that he did not know that Trooper Green was law enforcement. 2005 Trial Tr. vol. 4,

---

[9] Petitioner seems to concede this point, but argues that the specific facts in this case caused the aggravators to subsume each other. Reply at 17 ("While it may not be true in all circumstances, here, as shown, the two factors are subsumed by one another.").

909. While the prosecution could prove that Petitioner murdered a peace officer just from the facts of the murder itself, Petitioner's claim of ignorance that Trooper Green was law enforcement would cut against the avoid arrest aggravator.[10] The prosecution therefore had to advance other facts to establish that Petitioner killed Green to avoid arrest, such as Petitioner's earlier statements that he would kill an officer before he went back to prison. The prosecution clearly could not prove the avoid arrest aggravator just by showing that Petitioner murdered Trooper Green. The divergence of the facts necessary to prove the aggravators shows that the aggravators are not duplicative in the manner that Petitioner claims.

Petitioner cannot show that the OCCA's decision is contrary to or an unreasonable application of clearly established law, primarily because the Supreme Court itself has declined to adopt the duplicative aggravator theory. And even under that theory, it is clear that neither of the aggravators necessarily subsumes the other. Therefore, the OCCA was reasonable in denying this claim. Relief is denied as to Ground Four.

**E.  Ground Five:  Execution of the Mentally Ill.**

Petitioner claims that his death sentence violates the Eighth Amendment because he is severely mentally ill. Petition at 76. The OCCA denied this claim on direct appeal. *Malone*, 293 P.3d at 216.

---

[10] Petitioner did not advance that argument in his resentencing trial, but it nevertheless illustrates that more evidence was needed to prove the avoid arrest aggravator than simply that Petitioner murdered Trooper Green.

## 1. *Clearly Established Law*.

States cannot execute mentally retarded criminals under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Supreme Court noted in *Atkins* that the Eighth Amendment's prohibition on cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id*. at 311-12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). The Supreme Court identified state legislation as the "clearest and most reliable objective evidence of contemporary values," and concluded that the recent consensus showed a trend of states moving away from executing the mentally retarded. *Id*. at 312, 314-17. The Supreme Court found that the consensus mirrored the Court's own judgment, as executing the mentally retarded did not serve any retributive or deterrent aims and because mentally retarded criminals face a higher risk of wrongful execution due to their condition. *Id*. at 318-21.

In *Roper v. Simmons*, the Supreme Court similarly found a consensus of states moving away from executing those who committed their crimes as juveniles. 543 U.S. 551, 564-67 (2005). The Supreme Court noted that juveniles lack maturity and a sense of responsibility, are susceptible to peer-pressure, and possess less well-formed character and personalities. *Id*. at 569-70. The Supreme Court concluded that the trend in the states and the Court's own judgment weighed in favor of barring the execution of juveniles. *Id*. 578-79.

**2. *Analysis*.**

Petitioner claims that his death sentence is cruel and unusual punishment because he is severely mentally ill, not because he is a juvenile or is mentally retarded. This claim has no basis in precedent and does not rest on the same reasoning as *Atkins* and *Roper*. Namely, there are no relevant state trends. This Court has only located one state that bars the execution of the mentally ill, and that state has ended the death penalty for all future offenses. *The Supreme Court's Evolving Death Penalty Jurisprudence: Severe Mental Illness as the Next Frontier,* 50 B.C. L.Rev. 785, 798 & n. 88 (2009); Conn. Gen. Stat. § 53a-35a. This stands in stark contrast to the trends in *Atkins* and *Roper*, where multiple death penalty states ended executions for juveniles and the mentally retarded.

Petitioner rests his argument on the "evolving standards of decency," and asserts that since the Supreme Court bars execution of juveniles and the mentally retarded, it bars the execution of the mentally ill. But this Court can only grant relief if the OCCA's ruling ran afoul of clearly established Supreme Court precedent. There is no Supreme Court precedent to support this claim, and this Court cannot invent clearly established law to counter the OCCA's reasonable decision. Relief is denied as to Ground Five.

**F. Ground Six: Biased Juror.**

Petitioner claims that his first trial was unfair due to a biased juror. During jury selection, Juror KNA revealed that her cousin was murdered during a bank robbery in 1983. 2005 Trial Tr. vol. 2, 428. Juror KNA told the trial court that she was only a year old at the time, therefore that murder would not affect her opinion in Petitioner's case.

*Id*. at 428-29.  Juror KNA also told the trial court that she never attended any of the proceedings.  *Id*. at 429.  Defense counsel questioned Juror KNA at length about her ability to consider all of the evidence and all the potential punishments, after which he declined to challenge her for cause.  *Id*. at 431-33.  Petitioner did not challenge Juror KNA as biased in his direct appeal, but instead raised the issue in his second post-conviction proceeding.  *Malone*, No. PCD-2011-248, slip op. at 8.  Petitioner raised the issue as a stand-alone claim and as a claim for ineffective assistance of trial and appellate counsel.  *Id*. at 4-5, 8.  The OCCA found that the biased juror claim and the ineffective assistance of trial counsel claim were both procedurally barred.  *Id*. at 4-5.  The OCCA then addressed the merits of the appellate counsel claim and found that counsel did not perform deficiently nor did the omission of the biased juror claim affect Petitioner's appeal.  *Id*. at 8-9.

**1.  *Procedural Bar.***

Petitioner's framing of this issue is somewhat ambiguous, as he begins by raising a biased juror claim but ends by asserting a claim for ineffective assistance of appellate counsel.  Petition at 80, 85.  Perhaps Petitioner is raising both, but that is far from clear.  The simplest approach is to view the substantive claim as one alleging a biased juror, and treating the ineffectiveness claims as reasons to excuse the OCCA's procedural bar of the underlying claim.  In any event, the mechanism is irrelevant, because the outcome is the same under any approach:  Petitioner's biased juror claim and ineffective assistance of trial counsel claim are barred, and the meritless appellate counsel ineffectiveness claim cannot excuse the bar.

### a. *The OCCA applied an independent and adequate procedural bar.*

Petitioner argues that the procedural bar analysis is irrelevant because the OCCA addressed the claim on its merits. As noted previously, the Court applies the state bar even if the state court also provided an alternate merits analysis. *Supra* p. 30. Here, the OCCA clearly and expressly barred the biased juror claim and the ineffective assistance of trial counsel claim. *Malone*, No. PCD-2011-248, slip op. at 4-5. As discussed before, the bar is both independent and adequate. *Supra* pp. 21, 32. Therefore these claims are barred unless Petitioner can establish cause and prejudice to excuse the default.

### b. *Appellate counsel was not ineffective for omitting this claim.*

Petitioner claims that appellate counsel ineffectiveness excuses the default. The *Strickland* standard applies to ineffective assistance of appellate counsel claims. *Milton v. Miller*, 744 F.3d 660, 669 (10th Cir. 2014). To establish deficient performance, the petitioner must show that appellate counsel "unreasonably failed to discover [a] nonfrivolous issue[] and to file a merits brief raising [it]." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). Attorneys are not required to "raise every nonfrivolous issue on appeal," especially since weak claims tend to detract from stronger issues in the appeal. *United States v. Cook*, 45 F.3d 388, 394-95 (10th Cir. 1995) *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). While a petitioner can bring a *Strickland* claim "based on counsel's failure to raise a particular claim…it is difficult to demonstrate that counsel was incompetent" in that situation. *Smith*, 528 U.S. at 288. Even if a petitioner succeeds in that difficult task, he must still demonstrate that, absent the appellate counsel's deficient performance, there is a

reasonable probability that the petitioner would have prevailed on appeal. *Id*. at 285. Because the OCCA addressed and denied Petitioner's appellate counsel claim on its merits, AEDPA deference applies and Petitioner must show that the OCCA's determination was unreasonable. *Harrington*, 562 U.S. at 101, 105.

Petitioner must first show that the OCCA acted unreasonably in determining that appellate counsel reasonably opted not to raise the biased juror claim or challenge trial counsel's decision not to raise the issue during voir dire. The OCCA concluded that Petitioner failed to overcome the presumption that counsel rendered effective assistance, relying on the fact that appellate counsel filed an appellate brief that actually succeeded in winning a reversal of Petitioner's sentence. *Malone*, No. PCD-2011-284, slip op. at 9. The Court agrees that appellate counsel's success weighs in favor of a finding that appellate counsel's omission of the biased juror claim was reasonable. Appellate counsel clearly exercised professional judgment in raising some claims and omitting others, and counsel's efforts resulted in a reversal of Petitioner's sentence. It is not apparent that counsel's omission of the juror claim was unreasonable, and therefore the OCCA's decision was not unreasonable.

Even if appellate counsel's omission of the biased juror claim was unreasonable, there is no reasonable probability that the outcome of Petitioner's appeal would have been different had counsel included that claim because Petitioner's biased juror claim is meritless.

The "right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates

even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

Implied bias is a valid ground for challenging a juror's impartiality. *See Gonzales v. Thomas*, 99 F.3d 978, 985-86 (10th Cir. 1996). Whether a juror is impliedly biased is a legal determination "that turns on an objective evaluation of the challenged juror's experiences and their relation to the case being tried." *Id*. at 987. The implied bias doctrine is "reserved for those 'extreme' and 'exceptional' circumstances that 'leave serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.'" *Id*. (quoting *Smith v. Phillips*, 455 U.S. 209, 222 & n* (1982) (O'Connor, J., concurring)).

Implied bias exists where a juror is employed by the prosecuting agency, is closely related to a participant of the trial or criminal transaction, or was a witness or otherwise involved in the criminal transaction. *Id*. at 987. Similarities between the juror's experience and the facts giving rise to the trial can also indicate implied bias. *Id*. However, the similarities must be more than a superficial resemblance, and even a showing that the juror was the victim of the same crime for which the defendant is on trial is insufficient to establish implied bias. *See id*. at 989-90 (rape victim is not, as a matter of law, incapable of being impartial on a rape trial).

In this case, Petitioner lists four reasons why Juror KNA was impliedly biased: (1) she had a family member who was murdered; (2) she grew up around Lawton where both crimes occurred; (3) both cases were prosecuted by the same prosecutor; (4) and both crimes involved innocent bystanders and tragic deaths. Petition at 84. These superficial similarities are simply not enough to establish implied bias.

The fact that Juror KNA had a family member who was murdered is not enough to show bias. While Petitioner advances a general proposition that courts have found implied bias where a prospective juror has been the victim of a crime, the actual inquiry is whether the prospective juror's experiences are so similar in nature that they would "inherently create in a juror a 'substantial emotional involvement, adversely affecting impartiality.'" *Id*. at 989 (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)). Merely being part of a murder victim's family is insufficient.

Nor does the location of the crimes increase the risk of bias. Petitioner mistakenly argues that both crimes occurred in Lawton. Trooper Green was murdered near the town of Devol. *Malone*, 168 P.3d at 189-90. The case was tried in Lawton due to a change of venue. The city of Lawton and the town of Devol sit in different counties. While both communities are located in southwest Oklahoma, that is hardly a similarity that would trigger implied bias.[11] That the same prosecutor tried both crimes is also not persuasive, as Juror KNA never attended a single court proceeding related to her cousin's murder. The Court cannot say that the prosecutor's role in the two cases would inherently create in Juror KNA a substantial emotional involvement when she had no recollection of the previous proceedings. This is especially true since Juror KNA was a toddler at the time of her cousin's murder and trial. And finally, the fact that both murders involved "innocent bystanders and tragic deaths" does not establish significant similarities between the two murders. First, while Trooper Green was certainly innocent, he was hardly a

---

[11] The Court doubts that even if the crimes had both occurred in Lawton, it would be enough to show that Juror KNA was inherently biased.

bystander. Trooper Green was actively fighting and struggling to arrest Petitioner before being shot in the back of the head. The deaths during the bank robbery were apparently quite different. *See* Petition at 80 n.20. Second, most murders involve innocent bystanders and tragic deaths. Following Petitioner's logic, no person with a connection to a murder victim could ever serve as a juror. This proposition is much more expansive than the clearly established precedent regarding implied bias. Considered as a whole, Juror KNA's personal experiences are not so similar to the events of Trooper Green's murder that she would be impermissibly biased. The OCCA's similar finding was not unreasonable.

### 2. *Conclusion*.

The OCCA determined that appellate counsel's omission of the biased juror claim did not cause prejudice to Petitioner's appeal. That decision is not unreasonable, because appellate counsel acted reasonably in selecting claims for appeal, and the biased juror claim is without merit. As such, the appellate counsel claim fails and cannot serve as cause to excuse either the barred biased juror claim or the related ineffective assistance of trial counsel claim. Ground Six is denied as procedurally barred.

### G. Ground Seven: Cumulative Error.

Petitioner claims that even if individual errors in his trial were harmless, these errors were not harmless in the aggregate. Petition at 86. Petitioner raised this claim on both direct appeals. *Malone*, 293 P.3d at 218; *Malone*, 168 P.3d at 233. The OCCA found one error for faulty voluntary intoxication instructions in Petitioner's first trial.

*Malone*, 168 P.3d at 233. The OCCA did not find any error in Petitioner's resentencing trial. *Malone*, 293 P.3d at 218.

The cumulative-error analysis addresses the possibility that two or more individually harmless errors might "prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). This analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id*. at 1470. Cumulative error only warrants reversal if the many errors "collectively 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003) (quoting *Brecht*, 507 U.S. at 638). Instances where courts find deficient performance by counsel must also be aggregated, even if the ineffectiveness claim was ultimately denied for insufficient prejudice. *Id*. at 1207.

The OCCA found that the jury instructions on voluntary intoxication were in error. *Malone*, 168 P.3d at 201. The OCCA also found that trial counsel acted unreasonably by not objecting to the jury instructions and by not arranging a meeting between Petitioner and his expert prior to trial. *Id*. at 220-21. This Court has not found any additional errors. The Court is confident that these errors did not collectively have a substantial and injurious effect or influence on Petitioner's conviction. All three errors relate to Petitioner's voluntary intoxication defense. As already discussed at length, the evidence against that defense was overwhelming. Even if the jury instructions were proper, and

even if Petitioner's voluntary intoxication defense were more thoroughly prepared, the Court is not persuaded that the jury would have accepted that defense. Therefore, Ground Seven is denied.

## H. Ground Eight: Competency for Execution.

Petitioner claims that he is currently not competent to be executed, as he is insane under *Ford v. Wainwright*, 477 U.S. 399 (1986). Petition at 90. Petitioner concedes that this claim may not be ripe, and Respondent agrees. Petitioner raises this claim to preserve the issue if his execution becomes imminent. *Id.* The Supreme Court has held that the question of whether a defendant is competent to be executed is one that is "properly considered in proximity to the execution." *Herrera v. Collins*, 506 U.S. 390, 406 (1993). And Petitioner can, under Supreme Court precedent, raise this claim again if his execution becomes imminent. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998). Since Petitioner's execution is not imminent, his competency claim under *Ford* is premature and will be denied as such. Petitioner can raise this claim if his execution becomes imminent, should the same concerns still exist.

## VII. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery (Doc. 30) as well as a motion for an evidentiary hearing (Doc. 52). The Court initially denied Petitioner's motion for discovery (Doc. 61). After further review, the Court sees no reason to change that decision. Petitioner's discovery request is based on generalized suspicions that the prosecutors withheld exculpatory evidence. Petitioner's claims amount to a fishing expedition, searching for materials to support a claim that he has not raised. Petitioner's

requested discovery would not likely affect this Court's conclusion on any of Petitioner's claims. Therefore, Petitioner has not shown good cause for discovery. *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization).

In addition to his discovery request, Petitioner requests an evidentiary hearing with respect to his Grounds Two (ineffective assistance of trial counsel), Six, (biased juror claim) and Eight (competency). Mot. for Evid. Hr'g at 3-6. "The purpose of an evidentiary hearing is to resolve conflicting evidence." *Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. *Id.* at 859. An evidentiary hearing is unwarranted on Grounds Two and Six to resolve the legal issues. No information gained from an evidentiary hearing would affect the legal findings on those grounds. Regarding Ground Eight, the claim has been dismissed as premature. It would likewise be premature to conduct an evidentiary hearing on this issue. Therefore, the requests for discovery and evidentiary hearing are denied.

## VI.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief.  Accordingly, Petitioner's Petition (Doc. 24), motion for discovery (Doc. 30), and motion for an evidentiary hearing (Doc. 52) are hereby **DENIED**.  A judgment will be entered accordingly.

IT IS SO ORDERED this **28th** day of November, 2016.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE